IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


| | | |
|---|---|---|
| LINDEN JUHALA, | ) | CV 03-1137-HU |
| | ) | |
| Plaintiff, | ) | |
| | ) | FINDINGS AND |
| v. | ) | RECOMMENDATION |
| | ) | |
| JO ANNE B. BARNHART, Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

DAVID B. LOWRY
9000 SW Greenburg Road
Columbia Business Center, Suite 235
Portland Oregon 97223

       Attorney for Plaintiff

KARIN J. IMMERGUT
United States Attorney
CRAIG J. CASEY
Assistant United States Attorney
1000 SW Third Avenue, Ste 600
Portland Oregon 97204

DAVID J. BURDETT
Special Assistant United States Attorney
Social Security Administration
701 5th Avenue, Ste 2900 M/S 901
Seattle Washington 98104

Attorneys for Defendant

HUBEL, Magistrate Judge:

## INTRODUCTION

Plaintiff Linden Juhala brings this action for judicial review of a final decision of the Commissioner of Social Security denying his application for disability insurance benefits (DIB) under Title II of the Social Security Act. The court has jurisdiction under 42 USC § 405(g). The Commissioner's decision should be affirmed and the case should be dismissed.

## BACKGROUND

The relevant period for Juhala's claim runs from March 30, 1989, to June 30, 1992. The beginning of this period is established by prior adjudication. Juhala was found disabled due to "Chondromalacia and Degenerative arthritis, right knee" and received an award of benefits in 1979. Tr. 83.[1] The Commissioner later determined that his disability had ceased and terminated his benefits. Tr. 124. On March 29, 1989, the Commissioner denied Juhala's challenge to the cessation of benefits and concurrent application for a new period of disability. Tr. 364-70. The earliest date for which Juhala can be awarded benefits on his present claim is the first day after the prior adjudication, March 30, 1989.

---

[1]Citations to "Tr." refer to the page(s) indicated in the official transcript of record filed with the Commissioner's Answer After Remand. (Docket # 11).

The end of the relevant period is based on Juhala's insured status. He satisfied the insured status requirements for a claim under Title II through June 30, 1992, and must establish that he was disabled on or before that date to prevail on his claim.

Juhala was born March 3, 1949. He was 40 years old at the beginning of the relevant period and 43 on the date his insured status expired. He completed a GED and received technical training in welding. He worked as a boiler maker, mechanic and welder. He later earned 180 college credit hours of drafting and medical laboratory technician course work.

In 1978, he was injured and underwent a surgical fusion of the right knee which left his right leg two inches shorter than the left. Tr. 105. This was the basis of his original award of benefits. He received a diagnosis of degenerative disc disease of the lumbar spine in 1982. Tr. 285. In his present application, he alleged disability since August 1987, due to knee problems and degenerative disc disease of the lumbar spine. Tr. 376, 391, 428. He also claims that mental deficits contribute to his disability.

## DISABILITY ANALYSIS

The initial burden of proof rests upon the claimant to establish disability. *Roberts v. Shalala*, 66 F3d 179, 182 (9th Cir 1995). To meet this burden, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months. . . ." 42 USC § 423(d)(1)(A).

The Commissioner has established a five-step sequential process for determining whether a person is disabled within the meaning of the Act. *Bowen v. Yuckert*, 482 US 137, 140 (1987); 20 CFR § 404.1520. Each step is potentially dispositive.

At step one the Commissioner will determine that the claimant is not disabled if he is engaged in substantial gainful activity. 20 CFR § 404.1520(b). At step two the Commissioner will find the claimant not disabled if he has no medically determinable impairment that is "severe" within the meaning of the Act. *Yuckert*, 482 US at 140-41; 20 CFR § 404.1520(c).

At step three the Commissioner will find the claimant disabled if his impairments meet or equal the criteria for "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Yuckert*, 482 US at 140-41; 20 CFR § 404.1520(d). The criteria for these listed impairments, also called Listings, are enumerated in 20 CFR Part 404, Subpart P, Appendix 1 (Listing of Impairments).

If the adjudication proceeds beyond step three, the Commissioner must assess the claimant's residual functional capacity (RFC). The claimant's RFC is an assessment of the sustained work-related activities the claimant can still do on a regular and continuing basis, despite the limitations imposed by his impairments. 20 CFR § 404.1520(e), 404.1545; Social Security Ruling (SSR) 96-8p.

At step four the Commissioner will find the claimant not disabled if he retains the RFC to perform work he has done in the past. 20 CFR § 404.1520(e).

If the adjudication reaches step five, the Commissioner must determine whether the claimant can perform other work that exists in the national economy. *Yuckert*, 482 US at 141-42; 20 CFR § 404.1520(f). Here the burden shifts to the Commissioner to show that a significant number of jobs exist in the national economy that the claimant can do. *Yuckert*, 482 US at 141-42; *Tackett v. Apfel*, 180 F3d 1094, 1098 (9th Cir 1999). If the Commissioner meets this burden, then the claimant is not disabled. 20 CFR § 404.1566.

## THE ALJ's FINDINGS

At step one, the ALJ found that Juhala did not engage in substantial gainful activity during the relevant period. At step two, he found that Juhala suffered from impairments that are severe within the meaning of the Act, which he identified as "a history of knee problems, chronic low back strain/pain, obesity and a history of venous thrombosis" in the right leg. Tr. 730-31. At step three, he determined that Juhala's condition does not meet or equal the criteria for any of the presumptively disabling impairments enumerated in the Listing of Impairments.

The ALJ assessed Juhala with the following RFC:

> "a light level of exertion that allows him to walk in a slow and deliberate manner on even surfaces. He also is limited to work activities that do not require any kneeling and crawling and that do not require repetitive or prolonged twisting, bending or stooping. He must have ready access to a restroom. He is limited to simple, non-complex work tasks that involve minimal interaction with other people.

Tr. 732.

At step four, the ALJ found that Juhala could not return to any of his past work, which required medium exertion. At step five, the ALJ found that Juhala retained the RFC to perform other work in the national economy. He identified examples of such work drawn from the testimony of an impartial vocational expert (VE), including entry-level semiskilled work as a file clerk, copy operator and general clerk, and unskilled work as a mail clerk, electronics assembler and small parts assembler. Accordingly, the ALJ concluded that Juhala is not disabled and not entitled to benefits under Title II of the Act.

## STANDARD OF REVIEW

The district court must affirm the Commissioner's decision if the Commissioner applied proper legal standards and the findings are supported by substantial evidence in the record. 42 USC § 405(g); *Andrews v. Shalala*, 53 F3d 1035, 1039 (9th Cir 1995). "Substantial evidence means more than a mere scintilla, but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*

The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision. *Martinez v. Heckler*, 807 F2d 771, 772 (9th Cir 1986). The Commissioner's decision must be upheld, even if the evidence is susceptible to more than one rational interpretation. *Andrews*, 53 F3d at 1039-40. If the evidence supports the Commissioner's conclusion, the Commissioner must be affirmed; "the court may not substitute its judgment for that of the Commissioner." *Edlund v. Massanari*, 253 F3d 1152, 1156 (9th Cir 2001).

## DISCUSSION

The ALJ initially denied Juhala's present claim on May 3, 1997. On appeal, this court remanded that decision to permit the ALJ to make specific findings regarding Juhala's subjective pain testimony and expressly consider the lay testimony. Tr. 801-03. The remand directed the ALJ to formulate a vocational hypothetical question that included all the limitations offered by Juhala and his lay witnesses, unless the ALJ properly rejected their statements. Tr. 803. Despite the limited purposes of the remand, Juhala challenges the Commissioner's decision after remand on a number of additional grounds.

Juhala contends the ALJ erred in step three by failing to consider the combined effect of his impairments and failing to call a medical expert to determine whether his condition is equivalent to a presumptively disabling impairment enumerated in the Listing of Impairments.

Juhala challenges the ALJ's evaluation of the evidence in support of his RFC assessment. He contends the ALJ again failed to properly credit his subjective statements and the lay testimony of his sister about the severity of his symptoms. He raises the new challenge that the ALJ improperly ignored a document prepared by Ronald Grewenow, MD. Juhala contends the ALJ failed to apply the proper legal standards required by SSR 96-8p in evaluating his RFC.

Juhala reasserts his claim that the ALJ erred in step five by eliciting testimony from the VE with a vocational hypothetical question that did not accurately reflect all of his limitations. He now also claims that the ALJ relied on erroneous evidence about the number of jobs available in the regional and national levels of the economy.

Finally, Juhala contends that his earlier applications should be reopened based on new evidence.

## I.     The ALJ Was not Required to Revisit His Determination in Step Three

Juhala argues that the ALJ failed to consider whether the combination of his impairments was equal in severity to a presumptively disabling condition in the Listing of Impairments, 20 CFR Part 404, Subpart P, Appendix 1. He also claims that the ALJ erred by failing to call a medical expert to testify on the issue of equivalency. Juhala asserts that his condition is equivalent to the criteria for Listing 11.18 *Cerebral Trauma*, Listing 12.04 *Affective Disorders* and/or other unspecified Listings that might be identified by a medical expert.

The two Listings Juhala asserts require a claimant to demonstrate medically documented mental impairments resulting in a marked degree of limitation in two or more major areas of mental function. 20 CFR Pt 404, Subpt P, App 1 §§ 11.18, 12.04. In his initial decision, the ALJ found no medical evidence of any mental impairment during the relevant period. Tr. 14. On appeal, this court agreed and found that Juhala had failed to establish any limitations in mental function. Tr. 799.

The ALJ was not directed on remand to revisit these findings or reconsider his determination at step three. The statement Dr. Grewenow produced in the interim does not impose a duty to revisit the issue. Dr. Grewenow unequivocally stated that this document is not based on new findings, but on records from the relevant period. Tr. 737. The ALJ evaluated the contemporaneous records in his initial decision and his conclusions were upheld on appeal. Under these circumstances, this court declines to review the ALJ's determination in step three that Juhala failed to produce medical evidence establishing that his condition is equivalent to a presumptively disabling condition in the Listing of Impairments.

## II.   The ALJ Properly evaluated the evidence of Juhala's RFC

### A.   The ALJ's Credibility Determination was Legally Sufficient

In remanding the Commissioner's first decision, this court concluded that the ALJ failed to articulate specific findings to support a legally sufficient basis for discrediting Juhala's pain testimony. Tr. 801. At the first hearing, Juhala testified that in 1992, he felt pain every day in his lower back, radiating down the backs of both legs. Tr. 54. On a scale of zero to ten, with zero representing no pain and ten representing the worst pain imaginable, Juhala said that his pain was at eight, nine or ten at least 50 per cent of the time during 1992. *Id.*

At the hearing after remand, Juhala testified that when his pain was at a level of eight, nine or ten, he was not functional; he had to sit in a recliner or rest in bed and take medication or take a hot bath. Tr. 749. He said he had chronic pain during 1992 that ranged from one to ten, and did not drop to three or two very often. Tr. 750-51. He testified that "any physical activity would create severe pain of my back" requiring him to sit or lay down. Tr. 753. Wet or cold weather brought on severe pain. Tr. 754.

If a claimant produces objective medical evidence of an underlying impairment that could reasonably be expected to produce the symptoms alleged and no affirmative evidence of malingering exists, the ALJ must assess the credibility of the claimant regarding the severity of symptoms. *Smolen v. Chater*, 80 F3d 1273, 1281-82 (9th Cir 1996); *Cotton v. Bowen*, 799 F2d 1403, 1407-08 (9th Cir 1986).

Here Juhala presented objective evidence sufficient to support the conclusion that he suffers from some degree of pain in his knees and low back as a result of the severe impairments identified in step two. Accordingly, the ALJ was required to assess the credibility of Juhala's statements about pain.

The ALJ may discredit a claimant's testimony regarding the severity of symptoms by providing clear and convincing reasons for doing so. *Dodrill v. Shalala*, 12 F3d 915, 918 (9th Cir 1993); *Smolen*, 80 F3d at 1283. It is not sufficient for the ALJ to make a general assertion that a claimant is not credible. The ALJ must "state which . . . testimony is not credible and what evidence suggests the complaints are not credible." *Dodrill*, 12 F3d at 917-18; *Lester v. Chater*, 81 F3d 821, 834 (9th Cir 1995); *Reddick v. Chater*, 157 F3d 715, 722 (9th Cir 1998).

When making a credibility evaluation, the ALJ may consider objective medical evidence and the claimant's treatment history as well as any unexplained failure to seek treatment or follow a prescribed course of treatment. *Smolen*, 80 F3d at 1284. The ALJ may also consider the claimant's daily activities, work record and the observations of physicians and third parties in a position to have personal knowledge about the claimant's functional limitations. *Id.* In addition, the ALJ may employ ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms and other statements by the claimant that appear to be less than candid. *Id. See also* SSR 96-7p.

In the decision after remand, the ALJ found Juhala's testimony about pain and resulting limitations not totally credible. Tr. 731. The ALJ articulated adequate reasons to support this determination.

First, he relied on the lack of medical records produced during the relevant period. Background records show that Juhala had a diagnosis of scoliosis and degenerative disc disease of the lumbar spine long before the relevant period, in the early 1980s. Tr. 244, 248, 254, 475. He suffered an industrial accident which caused acute pain symptoms in his low back and right leg in 1981. Tr. 245, 248, 249. A CT scan in 1987 confirmed degenerative disc disease of the lumbar spine, but in October of that year, Juhala continued to demonstrate negative neurologic signs. Tr. 513.

The medical evidence from the relevant period is exceedingly scarce. Juhala developed a deep vein thrombus or blood clot in his right calf in August 1989. Tr. 507. He was hospitalized for treatment with anticoagulant medications and was observed ambulating about the ward without difficulty. Tr. 508. He had no pain on discharge from the hospital and his only

restrictions were to limit his activity to a moderate level and avoid trauma. Tr. 509. Juhala's treating physicians cleared him to return to work activities on August 23, 1989. Tr. 512. He continued on anticoagulants for six months. Tr. 677. He had no further symptoms from this condition until he developed a deep vein thrombus in the left calf in May 1994, well after his insured status expired. *Id.* It is reasonable to conclude that this condition contributed to Juhala's pain symptoms very briefly during the relevant period.

In April 1990, Juhala sought medical attention when his back went "out" from coughing. Tr. 505. He had a physical therapy evaluation in August 1990, but the records suggest that he did not participate for very long, if at all, at that time. Tr. 504. In November 1990, Dr. Grewenow noted that Juhala was "doing ok" but had more back pain and wanted to restart physical therapy. Tr. 501. In February 1991, Juhala was participating in physical therapy and planned to start swimming regularly; he reported "doing ok." Tr. 500. In July 1991, Juhala was still "doing ok," but had an increase in pain related to getting more exercise. Tr. 499.

In September 1991, Thomas Shinder, MD, recorded Juhala's description of a 10-year history of progressively worsening low back pain, but found "no evidence on neurologic examination for radiculopathy or any other neurologic deficit." Tr. 476. Dr. Shinder attributed Juhala's back pain to musculoskeletal strain, rather than the degenerative changes in his spine. *Id.*

In January 1992, Dr. Shinder requested an MRI of Juhala's spine. Tr. 498. There were not significant changes compared to the prior CT scan from five years earlier. *Id.* Juhala's degenerative changes did not appear to be causing any thecal sac or nerve root compression, although he continued to have mild disc protrusion at the L5-S1 junction. *Id.* In July 1992, a

radiological study to determine whether Juhala had unequal leg lengths was inconclusive. Tr. 497.

In February 1993, Juhala complained of pain and underwent another radiological study of the spine. Tr. 496. This showed "a trace of joint space narrowing," but no significant marginal changes, fracture, focal bone destruction or joint effusion. Tr. 496. The findings were described as "unremarkable." *Id.*

In August, 1993, a radiological study of Juhala's knees yielded normal findings. Tr. 495. In September 1993, Juhala went to the hospital for arthroscopic surgery on his left knee complaining that he had injured himself six months earlier while playing tennis. Tr. 493. He did not mention back pain at that time. *Id.*

The ALJ may not reject a claimant's testimony about the severity of his symptoms solely because it is not corroborated fully by objective medical findings. *Cotton*, 799 F2d at 1408. However, these records show more than the absence of objective medical findings to explain Juhala's claims. They show that during a period when Juhala claims he was suffering from incapacitating pain 50% of the time, he did not seek treatment to alleviate pain in a manner consistent with such circumstances. He sought treatment for pain when his back went out while coughing in the shower. He sought treatment when he injured his knee playing tennis. Nothing explains why he failed to seek treatment at other times during the relevant period. It was reasonable for the ALJ to conclude that Juhala would have been more persistent and aggressive in seeking treatment for pain if his symptoms had been as severe as described in his testimony.

The ALJ relied on the vagueness of Juhala's testimony about his pain symptoms during the relevant period. Tr. 731. For example, when asked to describe his pain during the relevant

period, Juhala testified: "In '92 I would imagine that the pain — I have chronic pain all the time and I'm sure at that time I did." Tr. 750. The ALJ could properly conclude from this testimony that Juhala lacked a clear recollection of the degree of pain he experienced during the relevant period.

The ALJ also relied on Juhala's description of his pain and the limitations on his activities after the relevant period to discredit his testimony about pain and limitations during the relevant period. Tr. 731. For example, Juhala testified that his pain has been steadily worsening since 1981. Tr. 750. This would mean that his condition during the relevant period was not as severe as it became afterwards. Yet he was able to play tennis in 1993, perform yard work in 1995 and travel to the Philippines in 1996, all well after the relevant period. Tr. 493, 621-22, 760. Such activities are inconsistent with his claims that during the relevant period, he was bound to a recliner 50% of the time and unable to engage in any physical activity.

The foregoing provide a substantial evidentiary basis to support legally sufficient reasons for the ALJ to conclude that Juhala overstated in his testimony the degree of pain he was experiencing during the relevant period.

### B. The ALJ Properly Considered the Lay Witness Testimony

Juhala contends the ALJ failed to articulate adequate reasons for rejecting the testimony of his sister, Reta Doyle. Friends and family members and others in a position to observe a claimant's symptoms and daily activities are competent to testify as to the claimant's condition. *Dodrill v. Shalala,* 12 F3d at 918. Such testimony cannot be disregarded without comment. *Nguyen v. Chater*, 100 F3d 1462, 1467 (9th Cir 1996). If the ALJ wishes to discount lay witness testimony, he must give reasons that are germane to the witness. *Id.*

Doyle testified that she saw Juhala about once a week on average for about one or two hours at a time during the relevant period. Tr. 756. She said that typically, Juhala just sat in a recliner during her visits. Tr. 758-59. Doyle claimed that Juhala tired easily with any activity during the relevant period and became irritable when pain flared up on a daily basis. Tr. 756.

The ALJ discounted Doyle's testimony because it was vague and because she lacked first hand knowledge. Tr. 731-32. He noted that her visits accounted for only a very small proportion of his daily life. This provides no basis for her claim that Juhala experiences daily pain. Doyle claimed that Juhala tired with activity, but was unable to describe activities that wore him out; during her visits, he typically sat in a recliner and did not engage in any activities. Doyle said that he had difficulty sitting through a two hour picnic during the relevant period, but could not explain how he was able to sit through a much longer flight to the Philippines in 1996 after his condition had worsened.

These reasons are germane and show that the ALJ gave proper consideration to Doyle's testimony.

### C.    The ALJ Was Not Required to Discuss Dr. Grewenow's Questionnaire

Juhala contends the ALJ totally ignored the physical assessment questionnaire prepared by Dr. Grewenow, which indicated limitations in sitting and standing abilities, reduced concentration and attention and a "psychological component to plaintiff's inability to perform work functions, such as a depressive disorder affecting pace and an ability to tolerate stress at work." Plaintiff's Opening Brief 19. Dr. Grewenow's physical capacities assessment was dated January 14, 2000, but purported to describe Juhala's condition as of 1992 "based on abstraction of medical records." Tr. 736-743. The ALJ did not mention Dr. Grewenow's questionnaire.

Generally, a treating physician's opinion is afforded the greatest weight in disability cases because the treating physician is employed to cure and has the best opportunity to know and observe the patient as an individual. *Ramirez v. Shalala*, 8 F3d 1449, 1453 (9th Cir 1993). A treating physician's opinion is controlling when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent" with other evidence of record. 20 CFR § 404.1527(d)(2).

Dr. Grewenow's opinion cannot be given significant weight because it is not supported by medically acceptable clinical and laboratory diagnostic techniques. The questionnaire asked Dr. Grewenow to identify the clinical findings and objective signs supporting his statement, but he listed none. Tr. 737. Dr. Grewenow expressly based his questionnaire responses on "abstraction of medical records" from 1992. Tr. 737. He did not identify specific records, but presumably referred to those already in the record of this case since there is no claim that the questionnaire was based on a new medical evaluation. Dr. Grewenow simply reviewed medical records that were already evaluated by both the ALJ and this court and reached conclusions that he inexplicably failed to express in the preceding eight years. The ALJ was entitled to rely on the original records, rather than the post hoc interpretation asserted eight years later that was not referenced to specific records.

Dr. Grewenow's conclusions about potential mental deficits are particularly unsupported by acceptable diagnostic techniques. Although the questionnaire purported to address Juhala's physical capacities, Dr. Grewenow was unable to even estimate his limits in most categories of physical function. Tr. 739-41. However, Dr. Grewenow endorsed significant psychological deficits without any indication that he ever conducted a psychological evaluation. Dr. Grewenow

opined that Juhala would require work at a reduced pace due to depression "likely present in 1992." Tr. 738. This court has already concluded that the contemporaneous records, including those of Dr. Grewenow, do not support a finding of significant limitations in mental function. Tr. 799.

Finally, Dr. Grewenow's questionnaire does not address any matter for which this case was remanded. The ALJ was directed to revisit his credibility determination, his evaluation of the lay witness statements and his formulation of the vocational hypothetical question. He was not required to evaluate new interpretations of old medical evidence. This court found no error in his consideration of that evidence in the previous appeal.

As Juhala argues, medical evaluations made after the expiration of a claimant's insured status may be relevant to evaluate his pre-expiration condition. *Smith v. Bowen*, 849 F2d 1222, 1225 (9th Cir 1988). The mere fact that Dr. Grewenow's questionnaire was not produced until eight years after Juhala's insured status expired does not render it incompetent or irrelevant. However, for the foregoing reasons, the ALJ was not required to revisit Dr. Grewenow's medical opinion. Accordingly, the ALJ's failure to discuss Dr. Grewenow's questionnaire is not reversible error as Juhala contends.

**D.**     <u>**The ALJ Satisfied the Requirements of SSR 96-8p**</u>

Juhala contends the ALJ failed to satisfy the requirements of SSR 96-8p by omitting a discussion of his ability to work on a regular and continuing basis and failing to identify restrictions in his work related abilities on a function-by-function basis. This argument is also beyond the scope of the order remanding the case. In any event, by evaluating all of the credible

evidence of Juhala's limitations and work restrictions, the ALJ complied with the requirements of SSR 96-8p.

Juhala has not identified any credible evidence that he is unable to complete a normal work schedule, if his activities are limited to light or sedentary exertion. A function-by-function assessment is evident in the ALJ's RFC assessment, which was not a blanket exertional category, but included detailed restrictions on walking surfaces, postural demands, access to a bathroom and situations that are unsuitable for Juhala's limitations in dealing with others.

Based on the foregoing, the ALJ's RFC assessment reflected the reasonable conclusions that could be drawn from the record as a whole, in accordance with SSR 96-8p.

### III. <u>The ALJ's Step Five Determination</u>

In step five, the Commissioner must show that the claimant can do other work which exists in the national economy. *Andrews v. Shalala*, 53 F3d at 1043. The Commissioner can satisfy this burden by eliciting the testimony of a vocational expert with a hypothetical question that sets forth all the limitations of the claimant. *Id.* The assumptions in the hypothetical question must be supported by substantial evidence. *Id.*

Juhala challenges the ALJ's step-five determination on three grounds. First, Juhala challenges the hypothetical question used by the ALJ to elicit testimony from the VE. Second, Juhala contends the VE's testimony as to the number of jobs available in the national economy lacked an adequate foundation. Third, Juhala contends the ALJ ignored documentation showing that the Department of Labor and the Oregon Employment Department do not publish estimates of the number of jobs available in each occupation code listed in the Dictionary of Occupational Titles.

**A.      The ALJ's Hypothetical Question Reflected Juhala's Limitations**

Juhala contends the VE's testimony was based on a hypothetical question that did not include "his limited walking/standing abilities, depression, obesity, reduced concentration and pace and a need for frequent rest breaks." Plaintiff's Opening Brief 25. However, the ALJ considered all the evidence and posed his vocational hypothetical question based on the limitations supported by the record as a whole. Because the ALJ did not find the above limitations asserted by Juhala supported by the record, it was not error for him to exclude them from his hypothetical question. *Magallanes v. Bowen*, 881 F2d 747, 756-57 (9th Cir 1989).

Juhala next contends that the hypothetical question did not reflect all the limitations identified in the ALJ's RFC assessment. Specifically, he believes the ALJ's hypothetical did not reflect his finding that Juhala needs "simple, non-complex work tasks that involve minimal interaction with other people." Tr. 732.

The ALJ's hypothetical question included "limited interaction with the public" and "minimal contact with the public." Tr. 761, 762. The ALJ did not include a limitation on interactions with coworkers or supervisors. This court concludes that the ALJ's hypothetical limitation on interactions with the public reasonably reflects the ALJ's RFC assessment. Juhala engages in family and social relationships, as reflected in the testimony of the lay witnesses at both hearings. Although he gets irritable and cranky, nothing suggests that he is unable to engage in routine daily interactions with individuals he is familiar with, such as family members, relatives, coworkers or supervisors.

The VE testified that a person who required house-bound employment to avoid contact with supervisors and coworkers would not be able to perform the jobs he identified in response to the ALJ's hypothetical question. Tr. 768. There is no evidence that Juhala's irritability would limit him to home-bound employment to avoid all interactions with coworkers or supervisors.

The ALJ's omission of a limitation to simple, non-complex work tasks is harmless under the present circumstances. The VE identified only entry-level jobs at the unskilled and lowest semi-skilled level. Tr. 764. By definition, such jobs require no more than the ability to understand, carry out and remember simple instructions. SSR 85-15.

**B.** **Juhala' Foundation Arguments Cannot be Sustained**

The VE identified a number of occupations from the Department of Labor publication *Dictionary of Occupational Titles* (DOT) that a person with Juhala's RFC would be able to perform. He identified these occupations by the appropriate DOT code and estimated how many jobs exist in Oregon and in the national economy for each. Tr. 761-62.

Juhala contends this testimony lacked foundation and should be disregarded under *Daubert v. Merrel Dow Pharmaceuticals, Inc.*, 509 US 579, 598 (1993). In *Daubert*, the Supreme Court ruled on the prerequisites for admissibility in federal trials of purported scientific evidence under Rule 702 of the Federal Rules of Evidence. *Id.* Under Rule 702, a district court judge must ensure that a purported expert's opinion rests on a reliable foundation and is relevant. *Id.* Juhala contends the VE's testimony regarding the number of jobs in each occupation is inadmissible because the ALJ did not ensure that it was based on a reliable foundation.

However, *Daubert* and Rule 702 have no application in the context of administrative hearings before an ALJ. An ALJ may receive evidence at such hearings even though the

evidence would not be admissible in court under the rules of evidence used by the court. 20 CFR
§ 404.950(c).

Before the hearing, Juhala introduced letters from the US Department of Labor Bureau of
Labor Statistics and the Oregon Employment Department. Tr. 981-82. Both agencies indicated
that they do not publish data on the number of jobs estimated or projected in the economy by
DOT code. *Id.* However, they do not purport to establish that a VE would be unable to estimate
those numbers with reasonable accuracy based on other published sources, education, experience
or the other bases of the VE's expertise.

Juhala had the opportunity to challenge the VE's qualifications and to explore the basis of
his opinion during the hearing. He chose not to ask the VE to describe the sources he consulted
in estimating the number of jobs existing in each occupation he identified. This is not an error
that can be attributed to the ALJ.

If the VE provides vocational testimony that conflicts with information in the DOT, the
ALJ is required to obtain an explanation for the conflict and discuss how the conflict was
resolved. SSR 00-4p. Here the ALJ was not required to resolve any conflict because the DOT
does not contain information about the number of jobs that could conflict with the VE's
testimony about the number of jobs.

## **RECOMMENDATION**

Based on the foregoing, the ALJ's decision that Juhala does not suffer from a disability
and is not entitled to benefits under Title II of the Social Security Act is based on correct legal

standards and supported by substantial evidence. The Commissioner's final decision should be AFFIRMED and the case should be DISMISSED.

## **SCHEDULING ORDER**

The above Findings and Recommendation are referred to a United States District Judge for review. Objections, if any, are due December 22, 2004. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.

If objections are filed, a response to the objections is due January 5, 2005, and the review of the Findings and Recommendation will go under advisement on that date.

DATED this  8th  day of  December , 2004.

/s/ Dennis J. Hubel
Dennis J. Hubel
United States Magistrate Judge